### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| VALDA JOHNSON,<br><br>                       Plaintiff,<br><br>    v.<br><br>GORDON HARTOGENSIS,<br>Director, Pension Benefit Guaranty<br>Corporation,<br><br>                  Defendant. | Civil Action No. 19-1998 (JMC) |

### MEMORANDUM OPINION

Valda Johnson sued her employer for intentional discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act (ADEA).[1] Defendant moved for summary judgment, and Ms. Johnson opposed. Because Ms. Johnson does not point the Court to record evidence sufficient to rebut the evidence adduced by her employer, the Court grants summary judgment to Defendant.

## I.  BACKGROUND

Unless otherwise indicated, the following facts are undisputed. Valda Johnson is a 56-year-old African-American woman. ECF 41-2 ¶ 1. In 1996, after eight years working in the private sector, ECF 41-4 at 1, Ms. Johnson began working at the Pension Benefit Guaranty Corporation (PBGC) as an actuary. ECF 41-2 ¶ 2. In 2006, she was promoted to Actuarial Technical Reviewer,

---

[1] Unless otherwise indicated, the formatting of quoted materials has been modified throughout this opinion, for example, by omitting internal quotation marks and citations, and by incorporating emphases, changes to capitalization, and other bracketed alterations therein. All pincites to documents filed on the docket are to the automatically generated ECF Page ID number that appears at the top of each page.

a position at the GS-14 level. *Id.* ¶ 3. During her time at the agency, Ms. Johnson served as President and Vice President of the Independent Union of Pension Employees for Democracy and Justice—the union that represented the majority of PBCG employees. ECF 41 ¶ 6; ECF 41-1 ¶ 1. In that capacity, Ms. Johnson participated in multiple EEO complaints filed by union members. ECF 41 ¶¶ 7-8. She also filed several EEO requests on her own behalf. *Id.* ¶ 10.

In 2013, following the restructuring of her department, Marjorie Brown (also an African-American woman over forty) became Ms. Johnson's first-line supervisor. ECF 41-2 ¶¶ 5, 7. Ms. Johnson and Ms. Brown had a contentious history. Ms. Johnson had filed multiple EEO complaints against senior leadership, including Ms. Brown, for discrimination. ECF 41 ¶¶ 9, 23. Shortly after Ms. Brown became Ms. Johnson's supervisor, she gave Ms. Johnson an overall performance rating of 4 (exceeds expectation) instead of the highest score of 5 (outstanding) on her annual performance appraisal—a score that Ms. Johnson contends deprived her of some amount of performance-based compensation. ECF 41-2 ¶ 11; ECF 41-1 ¶ 16. That overall rating of 4 was lower than Ms. Johnson had received in prior years, *see* ECF 39-1 at 119 (evaluation for 2010), 132 (2011), 143 (2012), but the same as an interim rating that Ms. Johnson received earlier in 2013 from her previous supervisor, *see* ECF 41-2 ¶ 10. Ms. Johnson does not challenge the interim rating in this litigation. In 2013, no employee in Ms. Johnson's division received a rating of 5 from Ms. Brown. *Id.* ¶ 14.

The federal government shut down on October 1, 2013. Three days after that, a financial specialist sent an email to the managers in Ms. Johnson's division advising them that the agency could not spend any money in the areas of "training, supplies, or equipment" during the shutdown. ECF 41-2 ¶ 22. Around that time, Ms. Johnson submitted a request that the agency pay $300 for her to attend a conference organized by the American Society of Pension Professionals and

Actuaries (ASPPA).[2] *Id.* ¶ 20. The agency denied the request, citing the policy outlined in the email from the financial specialist. *Id.* ¶¶ 22–23. Ms. Johnson asked the agency to reconsider its decision, and the agency denied that request on October 21, 2022. *Id.* ¶ 24. The next day, the agency informed Ms. Johnson that the hold on its training budget had been lifted and invited her to resubmit her request. *Id.* ¶ 25. Ms. Johnson refused. She wrote back in an email: "Too late—I had to pay for the training on yesterday. I had to use my own credit card. This will not serve as a cover for [the agency's] denial." ECF 39-1 at 366. Several months later, on January 6, 2014, Ms. Johnson filed an EEO complaint alleging that both her 2013 performance rating and the agency's decision not to fund her attendance of the ASPPA conference were discriminatory. ECF 41-11 at 1, 3.

In 2019, the agency posted two open jobs—a newly created GS-15 actuary position and a vacant GS-15 Supervisor position in Ms. Johnson's department. ECF 41-2 ¶¶ 38, 50. Ms. Johnson applied for both jobs. *Id.* ¶¶ 39, 52. Human Resources rated her amongst the "best qualified" candidates for each position, and she was invited to interview in person with a three-member selection panel. *Id.* ¶¶ 40–41, 53–54. However, Ms. Johnson was not selected for either job. For the actuary position, the panel chose Amy Scott, a white woman under forty, *id.* ¶¶ 19, 45, who had not been at the agency as long as Ms. Johnson, *see* ECF 41-25. According to the selecting official, the reason for the panel's decision was that Ms. Scott had "specific experience doing the work that is required under the position." ECF 39-1 at 490; *see also id.* at 501 (stating that Ms. Scott "had many years of experience responding to auditors and addressing audit

---

Ms. Johnson has provided conflicting testimony about when she made that request. She testified in her deposition that she made the request in October 2013, after the shutdown had occurred. ECF 39-1 at 41. The paperwork she submitted to make the request is consistent with that timeline. *Id.* at 66. However, Ms. Johnson later submitted an affidavit at summary judgment averring that she made her request in person and in September, before the shutdown began. ECF 41-1 ¶ 19.

recommendations," which Ms. Johnson lacked). Another panelist claimed that Ms. Johnson "did not fare well" in the interview. *Id.* at 478.

For the supervisor position, the committee selected David Joseph, an African-American male who was younger than Ms. Johnson—likely in his late thirties or early forties. ECF 39-1 at 481. According to the selecting official, the panel chose Mr. Joseph because he "had prior supervisory experience in addition to the technical actuarial experience required for the position." *Id.* at 494; *see also id.* at 504 (stating that Mr. Joseph had "several years supervising junior actuaries" and that "accuracy and timely completion [of work] was a demonstrated strength."). Ms. Johnson had not held a formal supervisory role at the agency, but had some experience mentoring, training, and reviewing the work of actuaries in her division, as well as "outside" supervisory experience at her church and with the union. *Id.* at 411. One panelist also noted that Ms. Johnson stated in her interview—apparently to her detriment—that she thought the job was "too big" and should be split into multiple positions. *Id.* at 504. Ms. Johnson subsequently filed an EEO complaint, alleging that the panel's hiring decisions were based not on candidate qualifications, but were made because she was an African-American woman over forty, and in retaliation for her previous EEO activity. *See id.* at 459-60.

In July 2019, Ms. Johnson's division held a "town hall meeting" for its staff, which she attended. ECF 41-2 ¶ 67. At the meeting, Janice Brown-Taylor, a leader at the agency, made public remarks. *Id.* ¶ 68. According to Ms. Johnson, during those remarks, Ms. Brown-Taylor made "derogatory comments concerning promotions in [Ms. Johnson's division] and implied Ms. Johnson's ineligibility based on her technical abilities and 'attitude.'" ECF 39-1 at 435. In September 2019, Ms. Johnson filed an EEO complaint involving that incident and several others. ECF 39-1 at 370–71. Ms. Johnson contends that those incidents were part of a pattern of "harassing

and humiliating statements made by managers" that—together with her negative performance appraisals, the threatened and actual manipulation of her work assignments, the refusal of her training requests, and the repeated failure to heed her requests for help—constituted a hostile work environment. ECF 41 at 31–32.

Ms. Johnson makes the following claims under Title VII and the ADEA.[3] First, she alleges that Defendant discriminated against her based on her race, color, gender, age, and in retaliation for her protected activity. She makes those allegations with regard to the following actions by the agency: her 2013 performance rating; the denial of training opportunities, including the decision not to pay for her to attend the ASPPA conference in 2013; and the decision not to hire her for either of the two GS-15 positions she applied for in 2019. Second, Ms. Johnson alleges that those same actions (together with others) constituted a hostile work environment in violation of Title VII. ECF 34 ¶ 31; *see also* ECF 41 at 31–32. Defendant moved for summary judgment, ECF 39, Ms. Johnson filed an Opposition, ECF 41, and Defendant filed a Reply, ECF 42.

## II.    LEGAL STANDARD

The Court will grant a motion for summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, "[t]he evidence is to be viewed in the light most favorable to the

---

[3] Ms. Johnson's claims derive from four EEO complaints that Ms. Johnson filed: 13-008-F (filed August 26, 2013), 14-008-F (filed January 6, 2014), 19-012-F (filed August 7, 2019), and 19-013-F (filed September 9, 2019). Because Defendant does not contend that any of Ms. Johnson's various discrimination or retaliation claims are untimely, the Court need not recount the procedural details surrounding those complaints.

nonmoving party and the court must draw all reasonable inferences" in that party's favor. *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

A party that moves for summary judgment must support its factual positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets that burden, it falls to the nonmoving party to establish that a genuine dispute exists regarding a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). To do so, the nonmoving party must demonstrate that "there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict for that party." *Talavera*, 638 F.3d at 308. The nonmoving party must produce more than a "scintilla of evidence" in support of its positions, *id.*, and its evidence must consist of more than unsupported allegations or denials. *See Celotex*, 477 U.S. at 322 & n.3. If the evidence cited by the non-moving party is "merely colorable" or "not significantly probative," summary judgment may be granted in favor of the moving party. *Anderson*, 477 U.S. at 249–50.

In making their arguments for or against summary judgment, both parties are responsible for pointing the Court to specific evidence in the record that supports their positions. Fed. R. Civ. P. 56(c)(1)(A); *see also Potter v. District of Columbia*, 558 F.3d 542, 550 (D.C. Cir. 2009). "[E]vidence laying dormant in the record is not enough." *Potter*, 558 F.3d at 550. "[T]he district court is not obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make its own analysis . . . of what may, or may not, be a genuine issue of material disputed fact." *Id*. That said, while a court is not required to consider uncited evidence, it retains the discretion to do so. Fed. R. Civ. P. 56(c)(3).

### III.   ANALYSIS

Title VII prohibits employers from discriminating "against any individual with respect to [their] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, the ADEA prohibits employers from discriminating "against any individual with respect to [their] compensation, terms, conditions, or privileges of employment, because of such individual's age," provided the victim of such discrimination is at least forty years old. 29 U.S.C. §§ 623(a)(1), 631(a). Both Title VII and the ADEA also prohibit retaliation against an employee because that employee "opposed any practice" made unlawful under that statute or participated in an investigation or legal proceeding thereunder. 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d).

In the absence of direct evidence of discrimination, courts generally evaluate both discrimination and retaliation claims under Title VII and the ADEA using the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under that scheme, a plaintiff must first establish a prima facie case of discrimination (or retaliation), at which point the burden shifts to the employer to present a legitimate, nondiscriminatory justification for the challenged action. *See, e.g.*, *Holcomb v. Powell*, 433 F.3d 889, 895–96 (D.C. Cir. 2006). However, once (a) an employee has established an adverse employment action, and (b) the employer has responded by articulating a legitimate, nondiscriminatory reason for that action, the *McDonnell Douglass* framework falls away. *Figueroa v. Pompeo*, 923 F.3d 1078, 1086–87 (D.C. Cir. 2019). Instead, the court simply asks: "[h]as the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason[,] and that the employer intentionally discriminated [or retaliated] against the employee?" *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see also Jones*

*v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (applying *Brady* to retaliation claims); *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008) (same, but for claims under the ADEA).

Here, the Court concludes that a reasonable jury could not make that determination. Defendant has submitted and cited to myriad evidence in support of the agency's nondiscriminatory justifications for each of its challenged adverse actions. In response, Ms. Johnson fails to cite to evidence sufficient to raise a genuine dispute, either that the agency's stated justifications for its actions were pretextual or that the real motives for those actions were discriminatory. Accordingly, the Court grants Defendant's Motion for Summary Judgment, ECF 39, on all of Ms. Johnson's claims: her 2013 performance rating; the denial of various training opportunities; the decision not to hire her for two open positions in 2019; and her claim that the above actions and others constituted a hostile work environment.

## A. The 2013 Performance Rating

A lowered performance appraisal that is tied to lost compensation can constitute an adverse action. *See Russell v. Principi*, 257 F.3d 815, 819 (D.C. Cir. 2001). Ms. Johnson contends that her 2013 performance rating negatively impacted her compensation, ECF 41-1 ¶ 16, and Defendant does not appear to challenge that contention. Instead, Defendant asserts a nondiscriminatory reason for Ms. Johnson's lowered rating: namely, that Ms. Johnson "failed to meet the performance standards required" for a higher one. ECF 39 at 23. In support, Defendant cites to Ms. Johnson's sworn acknowledgement that one of the components used to calculate her overall performance rating in 2013, her rating for "customer service," was negatively impacted because she had been unable to complete one of her assignments that year—the "Hartmarx" assignment—a performance-related reason that has nothing to do with Ms. Johnson's race, gender, age, or involvement in protected activity. ECF 39-1 at 311–12. Ms. Johnson's customer service rating of 3 appears to have been the main reason why her overall rating was 4 (exceeds expectations) rather

than 5 (outstanding). *Id*. at 203. Defendant also points to evidence that Ms. Johnson received an interim overall rating of 4 earlier in 2013 by a different supervisor (recall that Ms. Brown only became Ms. Johnson's supervisor around the time of her final evaluation). *Id.* at 164, 203. In Defendant's view, those facts establish that the lower rating Ms. Johnson received in 2013 reflected the quality of her work, not the personal feelings of her latest supervisor. Finally, Defendant argues that the notion that Ms. Johnson's rating was the result of Ms. Brown's discriminatory animus is undercut by the fact that Ms. Johnson had received scores of less than 5 for the "customer service" component of her rating in each of the three preceding years, ECF 39-1 at 128, 141, 150, that Ms. Brown had concurred with Ms. Johnson's higher overall ratings in those years, ECF 39 at 26, and that no employee in Ms. Johnson's division—white or black, younger or older—received an overall rating of 5 in 2013, ECF 39-1 at 332.

Ms. Johnson responds with two arguments. *See* ECF 41 at 31. First, she suggests that her history of protected activity, on its own, constitutes evidence of retaliation. She is wrong about that. The existence of protected activity, without more, is not enough for a jury to find retaliation has occurred.[4] *See Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation."). Ms. Johnson also contests the merits of her performance rating, contending that the rating was inconsistent with her "outstanding" work in 2013. ECF 41-1 ¶ 16. In support of that argument, Ms.

---

[4] The Court notes (although Ms. Johnson does not) that less than three months passed between Ms. Johnson's filing an EEO complaint against Ms. Brown, August 26, 2013, ECF 39-1 at 2, and Ms. Brown giving Ms. Johnson a lowered performance rating, November 7, 2013, *id.* at 204. *See Buggs v. Powell*, 293 F. Supp. 2d 135, 148 (D.D.C. 2003) (suggesting that a time span of less than three months may be sufficient to survive summary judgment on a retaliation claim). However, temporal proximity alone is not enough to establish retaliation where the employer shows that it was contemplating an adverse action before it became aware of the relevant protected activity. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001). Here, Ms. Johnson received an interim rating of 4 from a different supervisor on May 30, 2013, ECF 39-1 at 164, well before Ms. Johnson filed the EEO complaint. That fact, together with the other evidence in the record, including Ms. Johnson's statement that her rating suffered due to the failure of the Hartmarx project, combine to preclude a reasonable inference of retaliation.

Johnson cites to correspondence suggesting that her failure to deliver on the Hartmarx assignment was due to the substandard work of a contractor, and therefore not her responsibility. *Id*. But the fact that a contractor underperformed, even if true, does not show that the agency's decision to attribute some of that failure to Ms. Johnson was so irrational as to support a finding of pretext, especially because Ms. Johnson does not dispute that she did not complete an assignment. It is not for the Court to "second-guess an employer's business judgment," or to engage in "mere speculation[]" about an employer's reasons for taking an adverse action. *Brown v. Brody*, 199 F.3d 446, 459 (D.C. Cir. 1999), *overruled on other grounds by Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022). Mere disagreement with an employer's business judgment is "insufficient to create a genuine issue of fact" that its reasons were pretextual, let alone that an adverse action was discriminatory. *Id.* Put a different way, it is not the Court's job to decide whether it agrees with Ms. Johnson's performance rating, only to decide whether Ms. Johnson has adduced evidence to create a genuine dispute as to whether the rating was discriminatory under Title VII or the ADEA. Here, the Court finds that she has not.

Accordingly, the Court grants summary judgment for Defendant on her claims regarding the 2013 performance evaluation.

**B.  Denial of Training Opportunities**

In evaluating Defendant's motion for summary judgment on Ms. Johnson's claims involving the denial of training opportunities, the Court must first determine whether Ms. Johnson has established an adverse action with regard to those claims. In the past, courts in this jurisdiction have held that the "mere denial of training opportunities does not constitute an adverse employment action" unless it results in "an objectively tangible harm." *Pauling v. District of Columbia*, 286 F. Supp. 3d 179, 203 (D.D.C. 2017) (collecting cases). However, that proposition is in doubt following the D.C. Circuit's recent decision in *Chambers v. District of Columbia*, 35

F.4th 870 (D.C. Cir. 2022) (en banc). In that case, a woman sued her employer for discrimination after she was denied a series of lateral transfers to different units within her office. *Id.* at 873. The district court granted summary judgment to her employer on the ground that the plaintiff had "proffered no evidence that the denial of her transfer requests, even if motivated by discriminatory animus, caused her 'objectively tangible harm.'" *Id.* Breaking with precedent, the *Chambers* court reversed, disavowing the "objectively tangible harm" test (at least in the context of lateral transfers) and holding that *any* discriminatory act affecting the terms, conditions, or privileges of employment suffices as an adverse action under Title VII. *See id.* at 874–75. Here, the record shows that the PBGC regularly subsidized training opportunities for its actuarial staff. *See* ECF 39-1 at 334. Accordingly, those opportunities were a privilege of Ms. Johnson's employment, and the Court will assume that the denial of such opportunities was an adverse employment action.

Ms. Johnson alleges three such denials. First, Ms. Johnson contends that the agency discriminated against her when it denied her request for funding to attend the ASPPA conference in 2013. In response, the agency maintains that it had a legitimate reason for the denial—namely, the hold on the training budget instituted in response to the government shutdown in October 2013. ECF 39 at 24–25. Ms. Johnson does not dispute that the budget hold was genuine, or that it would have been a legitimate, nondiscriminatory reason to decline a request made in October 2013. Rather, she cites to a statement in her own declaration—signed on the same day she filed her opposition—as evidence that she in fact requested the funding *before* the shutdown, in September 2013. ECF 41-2 ¶ 20. In Ms. Johnson's view, that creates a genuine dispute that the agency's proffered reason for its denial was pretextual. However, the key statement in the declaration refutes Ms. Johnson's earlier testimony, in which she swore that she made the request in October. *See* ECF 39-1 at 41. Nor is there any support for the earlier timeline in the paperwork underlying her

request. *See id.* at 66. Ms. Johnson cannot create a dispute of fact to avoid summary judgment by submitting an affidavit that conflicts with her prior testimony and record evidence without providing any reason for the change in her litigation position. In the absence of any explanation from Ms. Johnson to account for the difference between her statements, the Court disregards Ms. Johnson's (apparently self-serving) statement in her declaration. *See Galvin v. Eli Lilly and Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007). As for Ms. Johnson's contention that Defendant's denial of funds for the ASPPA conference was discriminatory because a white colleague requested and received training funds in September 2013, that fails to create a genuine dispute as to disparate treatment for three reasons. First, the other employee's request was not for funds to attend the ASPPA conference or any similar event. ECF 39-1 at 334. Indeed, Defendant has submitted evidence showing that it did not pay for anybody to attend that conference in 2013. *Id*. Second, the other employee's training funds were approved in early September 2013, well before the government shutdown that the agency contends is the reason it denied Ms. Johnson's request. *Id.* Finally, the fact that the agency invited Ms. Johnson to reapply for the conference funds when the shutdown ended refutes her allegation that the initial denial was made for discriminatory reasons using the shutdown as a pretext. At that point, it was Ms. Johnson who declined to submit a renewed request for conference funding. ECF 39-1 at 366. Based on all of that, the Court finds that Ms. Johnson has not created a genuine dispute as to whether the agency's action denying her 2013 funding request was discriminatory.

Next, Ms. Johnson alleges that the agency discriminated against her when it denied her administrative time to study for various actuarial examinations, even though it did grant that time to other, white employees. ECF 34 ¶ 19; *see also* ECF 41 at 17–18. To survive summary judgment on that issue, Ms. Johnson would have to produce evidence that she requested study time and was

denied. *See Hairston v. Boardman*, 915 F. Supp. 2d 155, 162 (D.D.C. 2013) (plaintiff's failure to request training was legitimate non-discriminatory reason for employer's action in not sending him to training). But Ms. Johnson provides evidence of only one incident that could be characterized as a denial of a request for exam-related training. In October 2013, Ms. Johnson sent an email to Ms. Brown inquiring about sitting for exams and requesting information about what support the agency could provide if she did. ECF 39-1 at 68–72 (email chain). Ms. Brown told Ms. Johnson that she could not approve "the training you requested" because a more senior manager had already denied the request, which Ms. Johnson contends was not true. *Id.* at 68; ECF 41-1 ¶ 17 (explaining that, in reality, the senior manager had not yet denied that request).

As an initial matter, it is not entirely clear from the record what training Ms. Johnson was requesting in her email, or what Ms. Brown thought she was denying. *See* ECF 39-1 at 68–72. More to the point, Ms. Johnson fails to cite to evidence in the record that would create a genuine dispute that any denial that occurred in October 2013 was discriminatory. Although Ms. Johnson's declaration names—as comparators—five white colleagues who received exam support between 2012 and 2015, she cites to no evidence concerning those individuals' characteristics or circumstances other than her own description of their race.[5] *See* ECF 41-1 ¶¶ 17-18; *see also* ECF 39-1 at 334. Ms. Johnson cites to no evidence that those individuals were similarly situated to herself. Nor is there evidence that any of those other employees received training support during the shutdown (or, indeed, for months afterwards). *See* ECF 39-1 at 334. Finally, Ms. Johnson cites to no direct evidence of pretext, bad faith, or discriminatory intent by any of Ms. Johnson's supervisors in denying her request. In other words, even assuming that Ms. Johnson was denied a

[5] Ms. Johnson also declines to provide any information at all about the other (presumably non-white) employees who received training support over that same time period to support her allegation. *See* ECF 39-1 at 334.

request for study time in October 2013, the Court cannot find that she has created a genuine dispute that the denial was discriminatory.

Finally, Ms. Johnson alleges that she was denied access to "special assignments, projects and details" which could have helped advance her career at the agency. ECF 41 at 21; *see also* ECF 34 ¶ 21. Specifically, she cites to a deposition she gave in 2021 (two months before she filed her Fourth Amended Complaint, ECF 34) in which she suggests that, for "several years" prior to 2017, she had been requesting a special detail within the agency to gain experience towards a credential, and that, unlike similar requests made by two of her white colleagues, those requests had been denied. ECF 41 at 17–18 (citing to ECF 41-18 at 5–8). But Ms. Johnson cites to no specifics—which assignments she pursued, when, by whom those requests were denied, or even whether the assignments were available at the time—that would allow a reasonable jury to find that the agency discriminated against Ms. Johnson. *See id.* She therefore falls short of meeting her burden under Rule 56. *See Anderson*, 477 U.S. at 249–50. Based on the above, the Court grants summary judgment for Defendant on all claims involving the denial of training opportunities.[6]

## C.  Failure to Hire

"Failure to hire is an adverse employment action." *DuBerry v. District of Columbia*, 582 F. Supp. 2d 27, 36 n.7 (D.D.C. 2008) (citing *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004)). Similarly, "failure to promote is an adverse action so long as there is an open position." *Alston v. Ms. Johnson*, 208 F. Supp. 3d 293, 301 (D.D.C. 2016) (citing *Yarber-Butler v. Billington*, 53 Fed. Appx. 120, 120 (D.C. Cir. 2002)). To create a dispute that an employer's proffered explanation for a hiring decision is pretextual, a plaintiff must cite to evidence that tends

---

[6] To the extent Ms. Johnson's pleadings can be read to include any other allegations that the agency discriminated against her by denying her training opportunities, the Court determines that Ms. Johnson has failed to administratively exhaust those allegations in any of the four EEO actions underlying this case. *See* ECF 39-1 at 2–3 (13-008-F); *id.* at 23 (14-008-F); *id.* at 459–60 (19-012-F); *id.* at 370 (19-013-F).

to show the explanation is not merely mistaken or incorrect, but that it is "a lie." *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1288 n.3 (D.C. Cir. 1998). Thus, "[w]hen an employer says it made a hiring or promotion decision based on the relative qualifications of the candidates," and a plaintiff wishes to challenge that judgment solely on the merits of that decision, the plaintiff may prevail "only if the plaintiff was *significantly* better qualified for the job than those ultimately chosen." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008); *see also Aka*, 156 F.3d at 1294 ("In cases involving a comparison of the plaintiff's qualifications and those of the successful candidate, we must assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone.").

Here, the Court is sensitive to Ms. Johnson's subjective experience. It must have been frustrating to be twice passed over for promotions, each time in favor of candidates with shorter terms of service. Nonetheless, the Court concludes that Ms. Johnson has failed to create a genuine dispute that either of the challenged hiring decisions were discriminatory or made to retaliate against her.

### 1. *Actuary Position*

Defendant has asserted a nondiscriminatory reason for its decision not to hire Ms. Johnson for the actuary position: namely, that the candidate it did choose, Amy Scott, was more qualified for the job. ECF 39 at 29–30. In support of that explanation, Defendant cites to the posted qualifications for the position, which include: to "[o]versee the completion of experience studies and the periodic review of assumptions used to determine PBGC's liability for the single and multiemployer programs," to "[e]stablish and implement improvements in actuarial practice in order to prevent and address audit findings," and to "[p]rovide authoritative advice, guidance, and technical assistance for current actuarial issues related to defined benefit pension plans." ECF 39-1

at 616. Defendant also cites to Ms. Scott's resume, which shows she had substantial qualifications in all three areas, *id.* at 536–40, and to affidavits from all three members of the selection committee, each averring that Ms. Scott was chosen due to her superior qualifications, *id.* at 479, 490, 501.

Ms. Johnson argues that the difference between her qualifications and Ms. Scott's is overstated. She cites to evidence that, at the time Ms. Scott was selected, Ms. Johnson had been working at the agency significantly longer. ECF 41 at 21. Ms. Johnson also contends that the nature of their work had been, in large part, similar during that time. *Id.* Nonetheless, Ms. Johnson appears to concede that, at the time the panel made its decision, Ms. Scott was more qualified for the position. Indeed, Ms. Johnson complains that the reason Ms. Scott was more qualified was because she "was able [] to [boost] her experience in special assignments, projects and details that Ms. Johnson had not been afforded and/or had been outright denied," *id.*, though the exhibit she cites for this proposition does not support it. Thus, Ms. Johnson cannot prevail based on the candidates' qualifications alone.

Perhaps anticipating that conclusion, Ms. Johnson makes three other arguments that the decision to hire Ms. Scott was discriminatory—the first two of which are quickly disposed of, and the third of which requires a bit more attention. First, Ms. Johnson contends that there is direct evidence that the decision not to hire her for the actuary position was discriminatory: namely, that one member of the selection committee told Ms. Johnson that she was not hired because her relevant experience was "too old." ECF 41-1 ¶ 28. Although the Court recognizes that discriminatory intent is often communicated via coded language, the Court does not agree that, on this record, the statement about Ms. Johnson's experience is direct evidence of discrimination. Telling a candidate that their relevant experience is stale is not at all the same thing as telling a candidate they are too old. Moreover, the Court cannot say that it is unreasonable for an employer

to prioritize recent experience in making a hiring decision. *See, e.g., Lane v. Vasquez*, 961 F. Supp. 2d 55, 69–70 (D.D.C. 2013). That is particularly true here where Ms. Johnson's experience conducting "experience studies" appears to be decades old, tracking back to the 1990's. *See* ECF 41-4.

Next, Ms. Johnson argues that the entire hiring process was a sham because Ms. Scott was pre-selected (and even groomed) for the position due to her husband's position at the agency. ECF 41 at 22. But even if that contention were true, that type of nepotism would not be because of Ms. Johnson's race, color, gender, age, or protected activity, and would therefore not be actionable under either Title VII or the ADEA.

Finally, Ms. Johnson points to evidence that the agency has, over a period of years, systematically failed to hire or promote African-American women at the GS-14 level and above. ECF 41 16–17; *see also, e.g.*, ECF 41-14 at 36 ("The workforce data suggest that barriers may exist for African Americans in the recruitment and/or hiring processes for PBGC's occupations that lead to the senior level and SL levels."); ECF 41-16 at 50 ("[T]here is a significant decline in female representation for Blacks and Hispanics in grades GS-14, GS-15, and SL . . . in comparison to their representation rate in the total workforce."). In addition, Ms. Johnson highlights the career paths of two white employees, each of whom she contends progressed more rapidly than their African-American colleagues. ECF 41 at 15–16. Ms. Johnson suggests that the "lack of diversity in management" has led to "inherent bias" that exacerbates the problem of underrepresentation at the agency. *Id.* at 17. The Court does not minimize the gravity of these trends. Nor does it question the saliency of inherent bias as a driver of racial and gender inequality. Nevertheless, Ms. Johnson has not made a disparate impact claim in this case. Ms. Johnson claims only that the agency's decision not to hire her for the actuary position was the result of *intentional* discrimination based

on some combination of her race, gender, age, and protected activity. *Id.* For that purpose, demographics alone are insufficient.[7] *See, e.g.*, *Glenn v. Bair*, 643 F. Supp. 2d 23, 37 (D.D.C. 2009) ("[M]erely listing the [demographics] of some of the people who work within an office provides little evidence of . . . discrimination."); *Horvath v. Thompson*, 329 F. Supp. 2d 1, 10 (D.D.C. 2004) ("[E]vidence that merely indicates an underrepresentation of [a protected class] in the workforce does not itself establish pretext").

In summary, the Court concludes that Ms. Johnson has not created a dispute as to whether the agency intentionally discriminated against her on the basis of a protected characteristic. Nor does Ms. Johnson's record of EEO activity, or her self-identified status as a "problem employee[]," ECF 41 at 28–29, suffice to raise a genuine dispute that the decision not to hire her for the actuary position was retaliatory. Thus, the Court finds that Ms. Johnson has not carried her burden under Rule 56 and grants summary judgment for Defendant on Ms. Johnson's claim with regard to her non-selection to the actuary position.

    2.  *Supervisor Position*

Defendant has also articulated a nondiscriminatory reason for its decision not to promote Ms. Johnson to the G-15 supervisor position: that the candidate it did select, David Joseph, was more qualified for the job. ECF 39 at 35. In support of that explanation, Defendant cites to affidavits from all three members of the selection panel, each of whom aver that the panel chose Mr. Joseph because of his greater supervisory experience, ECF 39-1 at 481, 494, 504, plus the strong performance of the actuaries he had supervised, *id.* at 504. Defendant also submits Mr.

---

[7] Of course, such statistics can be probative of intentional discrimination in combination with other evidence. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339–40 & n.20 (1977). Here, the Court finds only that such "other evidence" is lacking, and that Ms. Johnson's statistics are not sufficient on their own to survive summary judgment, particularly in light of the qualifications of the selected applicant.

Joseph's resume, which confirms that Mr. Joseph had approximately four years of service as a "supervisory actuary," a role in which he was responsible for supervising, developing, and evaluating staff. *Id.* at 581. Although Ms. Johnson's resume states that she was responsible for "review[ing] and mentor[ing] lower graded and contractor actuaries," it includes no explicit supervisory experience. *Id.* at 580. In short, Ms. Johnson cites to no evidence that she had any experience at the agency handling the full suite of responsibilities that come with a formal supervisory position.

Regardless, Ms. Johnson argues that she was more qualified for the supervisor position because of her informal supervisory duties in her role at the agency, because she had more technical experience than Mr. Joseph, and because she had worked as a supervisor as the director of the music ministry at her church and in her role with the union. ECF 41 at 19–20; ECF 39-1 at 410–11. Ms. Johnson further argues that, to the extent Mr. Joseph had more supervisory experience than her, that should not have been a factor in the panel's decision because "supervisory experience" was not listed as an official requirement of the position. *See* ECG 39-1 at 623. As an initial matter, the Court notes that, even if "supervisory experience" was not listed as a formal qualification for the role, the position's responsibilities clearly encompassed supervising other employees, making an applicant's experience as a supervisor a reasonable consideration. *See id.* ("Responsibilities: . . . Provide supervisory direction by planning work to be accomplished by subordinates, set priorities, and assign work based on those priorities."); *see also Jackson v. Gonzales*, 496 F.3d 703, 709 (D.C. Cir. 2007) ("[W]e are aware of no previous case from this or any other circuit suggesting that an employee gets past summary judgment simply by showing that a factor in the hiring decision was not *expressly listed* in the job description when the factor was encompassed by the job description."). Moreover, even assuming that a reasonable jury could

19

conclude that Ms. Johnson and Mr. Joseph were *comparably* qualified for the position, her evidence falls well short of establishing that she was "*significantly* better qualified" than Mr. Joseph. *Adeyemi*, 525 F.3d at 1227. Given the lack of any other evidence of intentional discrimination, Ms. Johnson's arguments about the agency's demographics carry no more weight here than they did with regard to the actuary position. *See supra* Section III.C.1. Accordingly, because Ms. Johnson has not carried her burden under Rule 56, the Court grants summary judgment for Defendant on Ms. Johnson's claim that the agency discriminated against her when it failed to hire her for the supervisor position.

### D.  Hostile Work Environment

To prevail on a hostile work environment claim, a plaintiff must show that "she was subjected to discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014).[8] That requirement includes both a subjective and objective element. In other words, even if an employee subjectively views her environment as abusive, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Under that standard, neither the "ordinary tribulations of the workplace" nor "petty insults, vindictive behavior, and angry recriminations" are sufficient to sustain a hostile work environment claim. *Brooks*, 748 F.3d at 1277–78.

---

[8] It does not appear that either the Supreme Court or the D.C. Circuit have decided whether a hostile work environment claim can be brought under the ADEA. *See Shah v. Broad. Bd. of Governors*, No. CV 18-1328 (RDM), 2020 WL 6342947, at *11 (D.D.C. Oct. 29, 2020). Because Ms. Johnson's hostile work environment claim fails to survive summary judgment either way, the Court assumes (without deciding) that it can.

In addition to the actions already discussed, Ms. Johnson's hostile work environment claim includes: the comments made by Ms. Brown-Taylor at the townhall meeting, other non-specific comments and complaints by her supervisors, the failure of management to respond to Ms. Johnson's requests for assistance, the manipulation of Ms. Johnson's duties (including the reassignment of some of Ms. Johnson's training duties in 2018 or 2019), and one other performance appraisal that she was given around that time. ECF 41 at 31–32. Even considered in the aggregate, those incidents are not "sufficiently severe or pervasive to alter the conditions of her employment." *Brooks*, 748 F.3d at 1276. To take one point of comparison, in *George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005), the plaintiff alleged that over a four month period, her co-workers repeatedly shouted at her to "go back where she came from," she was singled out to perform clerical duties, her supervisor announced during a staff meeting that she was "causing problems" and that her coworkers should "keep their distance from her," and the supervisor "violently and angrily kicked a box" at the end of a private meeting. *Id.* at 408–09, 417. The Court held that a reasonable jury could not find that those events were "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Id*. at 416. Ms. Johnson's assorted allegations do not rise to nearly that level of severity. Nor does the evidence in this case show the same kind of repeated discriminatory comments, threats, and demotions that may give rise to a hostile work environment claim. *See Gritz v. Garland*, No. 18-cv-02712 (JMC), 2023 WL 4105182, at *6 (D.D.C. June 21, 2023). Therefore, the Court grants Defendant's motion for summary judgment on Ms. Johnson's hostile work environment claim.

## IV.   CONCLUSION

Having determined that Ms. Johnson has failed to establish a genuine dispute of material fact regarding any of her claims under Title VII or the ADEA, the Court grants summary judgment for Defendant on all claims and dismisses the case. **SO ORDERED.**

DATE: October 5, 2023

_____
Jia M. Cobb
U.S. District Court Judge